In re SECURITY ASSET CAPITAL CORPORATION, Debtor.

John A. Hedback, Trustee, Plaintiff,

v.

David Tenney, Defendant.

John A. Hedback, Trustee,

v.

Daniel J. Hill, a/k/a D.J. Hill & Associates, and D.J. Hill & Associates, Inc., Defendants.

Bankruptcy No. 04–32889.
Adversary Nos. 06–3328, 06–3329.

United States Bankruptcy Court,
D. Minnesota.

July 1, 2008.

Alan E. Brown, Larkin Hoffman Daly Lindgren Ltd., Bloomington, MN, for Defendant.

Timothy P. Griffin, Leonard Street and Deinard, St. Anthony, MN, Larry B. Ricke, St. Paul, MN, for Plaintiff.

## ORDER DENYING PARTIAL SUMMARY JUDGMENT AND GRANTING PARTIAL DISMISSAL OF ACTIONS

DENNIS D. O'BRIEN, Bankruptcy Judge.

The above entitled matter came before the Court on May 1, 2008, on cross motions for summary judgment and on the defendants' motion for dismissal of several counts in plaintiff's amended complaint. Appearances are noted on the record. Based upon the pleadings, briefs, and arguments of counsel, the Court being fully advised in the matter, now makes this **ORDER** pursuant to the Federal and Local Rules of Bankruptcy Procedure.

### SUMMARY

The plaintiff brought this proceeding against the defendants alleging numerous causes of action in connection with their control of the debtor in the year prior to bankruptcy. Pleaded in the amended complaint are these counts: first cause of action, breach of fiduciary duty; second cause of action, deepening insolvency; third cause of action, acting in concert; fourth cause of action, preferential transfer; fifth cause of action, fraudulent transfer; sixth cause of action, disallowance of

Claims of defendant Tenney; seventh cause of action, ultra vires recision; and, eighth cause of action, statutory recision. The plaintiff seeks summary judgment on first and fourth cause of action. Summary judgment is denied on the first cause of action because the Court finds that the issue presents unresolved questions of material fact. Summary judgment is denied on the fourth cause of action because the Court finds that the existing record does not demonstrate that the alleged preferential payments received by the defendants were for antecedent debts.

Defendants seek dismissal of the second through the eighth causes of action and summary judgment on the first cause of action. The second, third, fourth, seventh and eighth causes of action are dismissed because the Court finds that they are redundant. Summary judgment is denied on Count I because the Court finds that the issue presents unresolved questions of material fact.

## II

### FACTS

Security Asset Capital Corporation, (SACC), was founded in 1993 to operate within the asset liquidation industry. Its historic operations were focused on the management of debt receivable portfolios, which included buying and selling portfolios on a wholesale and retail level. In its 10K filing for the period ending December 31, 2001, however, SACC stated that it did not expect any significant income from its debt portfolio.[1] Thus, SACC would not be depending on debt purchasing and collecting for its income.

In 2002, SACC attempted to reposition itself. On July 26, 2002, SACC entered into a one-year limited license with James Burchetta, the owner of a business method patent for an on-line financial settlement and collection service. The license gave SACC the nonexclusive right to "create[ ] an automated system to be used in conjunction with other systems either developed or under development by the Company solely for the purposes of the settlement and/or collection of consumer debts in the United States." The license entitled SACC to use certain intellectual property to develop an on-line consumer debt resolution system. The license further provided that SACC would be entitled to renew it for an additional ten year period if SACC met certain benchmarks, including having its stock traded on a public exchange, having a market capitalization of $30 million and annual revenues of $1 million.

Meanwhile, in February 2002, due to SACC's earlier issuance of unregistered promissory notes, an investigation was initiated by the SEC enforcement division, the Federal Bureau of Investigation, the United States Attorney for the Eastern District of Pennsylvania, and the Pennsylvania Securities Commission. The investigation targeted the company and included the role played by its officers, directors, and controlling shareholders.

About that same time, SACC's CEO, President and Secretary (who also served as directors), were served with a subpoena by the SEC in connection with its investigation of SACC. They responded by asserting their Fifth Amendment right against self incrimination. Defendant Hill

---

1. A 10K filing is a comprehensive summary report of a publicly traded company's performance that must be submitted annually to the Securities and Exchange Commission. Typically, the 10K contains much more detail than the annual report. It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc.

did not receive a subpoena from the SEC because the SEC was unable to locate him. Notes from the file of SACC's attorney Clyde Munsell dated November 4, 2002, reflect that he had informed the SEC, in response to their request to locate Hill, that he "believe[d] Mr. Hill was homeless and, if [he] could find him or find the phone number or he called again, [he] believe[d] the Fifth Amendment was acceptable to him."

On March 11, 2003, David Walton, Jr., SACC's CEO and Chairman of the Board of Directors, died unexpectedly. At this point, SACC's sole employee was its President, Darrell Musick, and SACC had approximately $8,000 in cash. But, SACC was to receive funds exceeding $1,000,000 on a key person life insurance policy on David Walton, Jr.

On March 13, 2003, directors Musick and Defendant Hill elected Hill as Chairman of the SACC Board of Directors and Chief Executive Officer, and approved a consulting agreement with D.J. Hill & Associates, Inc. at $5,000 per week. Hill set about to: (1) obtain short-term financing to fund SACC's immediate operations, (2) secure the payment of the life insurance benefit, (3) file SACC's December 31, 2002 10k (due on March 31, 2003); and, (4) negotiate an extension of the June 25, 2003 one-year limited license agreement with Debt Resolve.

On May 7, 2003, the SEC's enforcement division sent notice to Hill as CEO of SACC, Darrell Musick, President of SACC, and David S. Walton Sr., former Secretary of SACC, stating that the SEC intended to initiate legal action against SACC, Musick and Walton Sr. On May 22,

2003, SACC filed its 10K for the period ending December 31, 2002. On May 28, 2003, SACC's auditor quit because SACC had filed the 10K without its consent and before the audit was completed. On June 18, 2003, SACC filed an 8K withdrawing the December 31, 2002 10K, and disclosing that its auditor had withdrawn. The last substantial business activity of the Debtor was in June 2003.

On June 19, 2003, SACC received a letter from the patent licensor's attorney terminating the license agreement one-week prior to its expiration based on alleged breaches by SACC. On June 27, 2003, SACC's attorney, James Diracles, sketched alternative workout plans, one informal and the other in a Chapter 11 bankruptcy. Diracles preferred the informal plan, stating that potential payout to creditors would be higher. The essence of the informal plan was to pursue a legal claim against former directors for failure to repay a promissory note in the face amount of $1.2 million, and to resolve the securities enforcement issues with the SEC Enforcement Division, Pennsylvania Commissioner of Securities, and the U.S. Attorney for the Eastern District of Pennsylvania. Under either plan, Defendant Hill was to leave the company "shortly after the insurance proceeds are received." Musick was to execute either of the plans.[2]

On July 23, 2003, the net insurance proceeds in the amount of $1,173,363.01 were wired to the trust account of Best & Flanagan. On July 25, 2003, SACC, by letter from one of its attorneys, proposed a settlement of the SEC matter with a detailed plan that it claimed would provide the best return for the Note Purchasers. The pro-

---

**2.** In its July 25, 2003, offer of settlement to SEC, SACC proposed that Musick would leave the company and that defendant Hill would remain a director and defendant Tenney would be added as a director. Musick left SACC shortly thereafter and Tenney became CEO of the company on November 26, 2003. On August 29, 2003, Tenney had been made a director.

posal represented that, under the plan, recovery of Note Purchasers would be in a range from $872,000 to $4,000,000. Alternatively, the proposal stated, recovery in a Chapter 7 liquidation would yield creditors such as the Note Purchasers $53,016 of the $1,207,000 in cash assets or 6/10 of 10 on each dollar of debt. The proposal was never accepted by the SEC.

On October 23, 2003, the Defendants met with the SEC and gave deposition testimony. They were represented by two attorneys from two different law firms paid for by SACC. Mr. James Diracles of Best & Flanagan (an SACC shareholder) and Mr. John Carroll of Carroll and Broteman. Defendant Hill denied serving as an officer or director of SACC prior to March 13, 2003, and denied having any role or responsibility in the issuance of the unregistered promissory notes.[3] The focus of the examination turned to the defendants' roles in the filing and subsequent withdrawal of SACC's December 31, 2002 10K.

On February 18, 2004, the SEC filed a civil action against SACC, former SACC President Darrell Musick, former SACC Secretary David S. Walton, and former SACC CFO Richard Wensel in United States District Court in the Eastern District of Pennsylvania.[4] The Complaint alleged violations of Securities Act of 1933 and the Securities Exchange Act of 1934, and the regulations promulgated thereunder. The SEC sought injunctive relief, disgorgement of ill-gotten gains, civil penalties, and officer and director bars. On May 12, 2004, SACC filed a Chapter 11 bankruptcy petition.

Between July 23, 2003, and the bankruptcy filing, the defendants caused funds to be transferred from the Best & Flanagan trust account to the operating account of SACC (or directly to their own accounts) in order to pay themselves consulting fees and compensation as well as pay other selected creditors. Defendant Hill received directly or indirectly $185,900, and defendant Tenney received $114,900. At the same time, the defendants told creditors "we are currently under SEC investigation and our Corporate Counsel has our funds in Escrow pending the outcome of this investigation," and that they were "currently paying only essential bills to insure that the corporation continues to operate."

## III

## PLAINTIFF'S MOTIONS

### *Breach of Fiduciary Duties Claim.*[5]

*Generally.*

█ Officers and directors owe fiduciary duties to their corporations. When corporations are solvent, the beneficiaries of the performance of those duties are the shareholders. Shareholders are also the victims of breach. Creditors of solvent corporations are unaffected by either performance or breach of fiduciary duties by officers and directors, unless breach causes corporate insolvency.

█ When corporations are in the "zone of insolvency,"[6] or actually insolvent, cred-

---

3. Corporate documents, including a memo authored by Hill, indicate that he had been a director from either 1998 or 2000.

4. Neither defendant was personally charged by SEC in connection with the SACC investigation.

5. The parties agree that Nevada law applies to this cause of action, and that, in the absence of Nevada law, Delaware law applies.

6. The "zone of insolvency" has not been defined.

itors become recognized beneficiaries of the performance of fiduciary duties by directors and officers to their corporations. That is because insolvency expands the risk of corporate loss beyond shareholders to corporate creditors. *Production Resources Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 791 (Del.Ch.2004).

While protection by the performance of fiduciary duties is expanded to include creditors of insolvent corporations, the nature and extent of the performance of fiduciary duties by directors and officers of insolvent corporations do not change. The duties are still owed to the corporations, not to any specific group or class of protected beneficiaries.[7] *Production Resources Group, LLC. v. NCT Group, Inc.,* at 792. And, the duties are performance driven by corporate loyalty and the exercise of due care. See, e.g., *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 179 (Del.1985); *Emerald Partners v. Berlin,* 726 A.2d 1215, 1221 (Del. 1999); NRS § 78.138. Accordingly, officers and directors of insolvent corporations are not obligated, as a matter of law, to liquidate their corporations for the benefit of unsecured creditors, but, can pursue risky restructuring plans in good faith attempts to regain solvency. *Official Committee of Unsecured Creditors of RSL COM Primecall, Inc. v. Beckoff (In re RSL COM Primecall, Inc.),* 2003 WL 22989669, *8 (Bankr.S.D.N.Y.2003); *In re Ben Franklin Retail Stores, Inc.,* 225 B.R. 646, 655 (Bankr.N.D.Ill.1998).

Directors and officers are protected from liability for corporate governance by the "business judgment rule." The protection is not lost in insolvency.

*RSL COM Primecall, Inc.,* 2003 WL 22989669 at *8. The rule shields directors and officers from liability for actions and decisions that, even in retrospect, might be seen as clearly erroneous and damaging to their corporations. See *In re Hechinger Inv. Co. of Del.,* 327 B.R. 537, 549 (D.Del. 2005); *Roselink Investors, L.L.C. v. Shenkman,* 386 F.Supp.2d 209, 221 (S.D.N.Y.2004); *Official Committee of Bond Holders of Metricom, Inc. v. Derrickson,* 2004 WL 2151336, *2 (N.D.Cal. 2004); *In re Verestar, Inc.,* 343 B.R. 444 (Bankr.S.D.N.Y.2006); *In re Caremark Int'l. Inc. Derivative Litig.,* 698 A.2d 959, 967 (Del.Ch.1996).

So, breach of fiduciary duty by directors and officers is practically limited to their self-dealing to the detriment of their corporations, even in corporate insolvency. Breach of fiduciary duty through self-dealing is intensely fact driven. Absent outright theft or conversion of corporate property, summary judgment is usually not appropriate. It is not appropriate here.

*Specifically.*

Summary judgment is appropriate where there exist no questions of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hegg v. United States,* 817 F.2d 1328, 1331 (8th Cir.1987). Here, there are unresolved questions of material fact.

Alternative liquidation plans were sketched in a memo to Hill by one of SACC's attorneys, James C. Diracles, in

---

7. Assigning duties of performance for the benefit of specific groups or classes would often result in performance paralysis, even if limited to unsecured creditors. Interests of priority claims, unsecured bondholders, trade creditors, and general unsecured creditors are often conflicting. And, not all creditors of a particular class or group might agree on what might be best for the class or group.

June 2003.[8] The one favored by Diracles, an informal liquidation, would provide an opportunity for greater return to creditors, according to him.[9] Another of SACC's attorneys valued certain litigation against former directors, carried on SACC's books at a value of $400,000, as having an actual value from $1,000,000 to $5,000,000.[10]

The plaintiff argues that the defendants inflated the value of the litigation to justify their own continued self-dealing in collecting consulting fees. But, the existing record indicates that the value of the litigation was the opinion of an attorney who was asked to render one for SACC. The plaintiff has not shown that the attorney was directed or unduly influenced by the defendants in connection with the opinion.

The plaintiff argues that the defendants grossly misrepresented the return to creditors in a Chapter 7 liquidation by stating in SACC's July 25 settlement proposal that if SACC filed a Chapter 7 liquidation, SACC's "unsecured creditors such as the Note Purchasers would receive 6/10 of 1¢ on each dollar of debt," $53,016 of the $1,207,000 in cash assets. In arriving at this figure, the proposal recited that these expenses and priority claims would limit the recovery for unsecured Note Purchasers: (1) $90,000 in operating expense during the liquidation; (2) $100,000 for a bankruptcy attorney; (3) $490,083 in priority wage claims; and (4) $589,900 in secured creditors claims. The plaintiff argues that these deductions are inconsistent with the facts. For example, SACC had a

single employee in March of 2003, its CEO, Darrell Musick. Priority wage claims at the time were limited to $4,925 per employee for 90 days prior to the petition date.

The record does not disclose who came up with these numbers or upon what they were based. And, an explanation is in order. But, they do not necessarily show nefarious conduct or motive by the defendants required to support summary judgment. It is true that in March 2003 Musick was SACC's only employee. But, by the time that the settlement proposal was made to SEC, Hill and Tenney had been paid consulting fees exceeding $400,000. Whether these payments are included in the $490,000 described as "priority wage claims" remains to be seen. If so, the payments are mis-characterized as "priority wage claims" in the bankruptcy sense, but it does not necessarily follow that the assertion was a misrepresentation to facilitate ongoing self-dealing. If not included in the $490,000 "priority wage claims," then the necessary question is what else is included.

The plaintiff argues that Defendant Hill admitted violating his fiduciary duties by acknowledging that his sole motivation in the performance of his responsibilities at SACC was driven by what he considered to be in the best interests of its shareholders. By focusing on the best interests of shareholders, the plaintiff claims, Hill violated his duty owed to unsecured creditors of the insolvent SACC.

8. Diracles was also a shareholder of SACC.

9. But, a statement in the memo sketching the alternative proposals suggests another motive. He said in the memo that "[a] major difficulty with the latter approach [Chapter 7] is the SEC Enforcement Action." In Chapter 7 the Company would be less able to assist in this defense, which would have an impact on the

three individual the defendants: Darrell Musick, Dick Wenzel and Dave Walton, Sr.

10. The opinion, memorialized in a letter from attorney, Peter H. Benzian, was presented to SEC with the settlement proposal on July 23, 2003.

The statement by Hill is a curious one for someone of his experience to have made.[11] But, it is not clear what he meant by it. Certainly, if he acted to shield shareholders personally from SEC action, that constitutes a violation of fiduciary duties owed to the corporation. But, if he acted to maximize return to the shareholders, he did not necessarily violate any fiduciary duties to the corporation. Shareholders of insolvent corporations are last in line and there is nothing for them until creditors have been provided for. The statement by itself does not support findings required for summary judgment.

The driving force behind the plaintiff's motion for summary judgment seems to be the understanding, apparently supported by the plaintiff's expert, that the defendants owed a fiduciary duty exclusively to the insolvent debtor's unsecured creditors; and, that the duty could only have been fulfilled through a Chapter 7 liquidation.[12] That is not the law. The duty remained owing to SACC, the corporation, with unsecured creditors protected as included beneficiaries of the duty due to the insolvency. But, no particular form of liquidation, or indeed any liquidation at all, was required as a matter of law, even if there was no reasonable prospect for a return to shareholders. The issue, a question of fact, is whether the defendants violated their fiduciary duties to the insolvent corporation through self-dealing. That issue

cannot be resolved by summary judgment in this case.

### Preferential Transfer Claim

■ The plaintiff makes a lengthy argument that the payments received by the defendants Hill and Tenney, allegedly pursuant to consulting contracts, between May 13, 2003, and May 12, 2004, are recoverable preferential transfers under 11 U.S.C. § 547. From the present record, though, it seems clear that the payments were either appropriate payments for services rendered or they were fraudulent transfers. Characterizing the payments as preferential transfers assumes that they were received for legitimate, though antecedent, debts. Whether the payments received by the defendants were legitimate is an issue. But, nothing in the existing record suggests that they were for antecedent debts.

## IV

## DEFENDANTS' MOTIONS

The defendants seek dismissal of several counts pleaded in the amended complaint, and summary judgment on the breach of fiduciary duty count.[13] In addition to breach of fiduciary duty, the plaintiff pleaded causes of action for deepening insolvency, acting in concert, preferential transfers, fraudulent transfers, disallowance of claims of Tenney, ultra vires rescission, and statutory rescission.

11. Hill represents in a resume "[ex]perience as a CEO/COO/VP & GM/Executive Director, leading High Technology Companies for over 20 years. In addition to traditional P & L responsibility, significant focus has been: high growth companies, startups and turnarounds."

12. The expert, in his report, states that "[f]urther, it is my understanding that fiduciary duties are owed exclusively to creditors (to the exclusion of shareholders) when a corpo-

ration is insolvent and has ceased doing business altogether or without reasonable prospect of success that could possibly yield a recovery to shareholders."

13. In their brief, the defendants seek dismissal of the breach of fiduciary cause of action, but the arguments they make are properly considered in the context of summary judgment.

*Deepening Insolvency.*

A. Theory of Deepening Insolvency

1. Origins of Deepening Insolvency

a) American law reflects a preference for continued corporate existence. This preference is seen through the availability of Chapter 11 reorganization for businesses. See e.g., *Kittay v. Atlantic Bank of N.Y. (In re Global Serv. Group)*, 316 B.R. 451, 460 (Bankr.S.D.N.Y.2004) (noting that "chapter 11 is based on the accepted notion that a business is worth more to everyone alive than dead").

b) Continued corporate existence is often seen as a benefit because it fosters economic growth, maintains employee jobs, provides incentive for risky, but possibly rewarding, business undertakings, and generally benefits the "community of interests" that sustain a corporation.

c) The theory of deepening insolvency, however, carves an exception to this general rule and suggests that where the corporation is artificially prolonged through fraud or wrongful conduct, such existence cannot be deemed beneficial to either the corporation or its creditors. See e.g., *Global Serv.*, 316 B.R. at 456 (" 'Deepening insolvency' refers to the 'fraudulent prolongation of a corporation's life beyond insolvency,' resulting in damage to the corporation caused by increased debt.") (citations omitted).

*ABA Section of Litigation Annual Conference, April 11–14. 2007: Potential Liability For Deepening Insolvency And Breach Of Fiduciary Duty to Creditors, pp. 24, 25.*

Recognition of "deepening insolvency" is not universal, and those jurisdictions that do recognize the concept are not in agreement whether it is a separate cause of action or a measure of damages. See, generally, *ABA Section of Litigation Annual Conference, April 11–14. 2007: Potential Liability For Deepening Insolvency And Breach Of Fiduciary Duty to Creditors*, pp. 24, et seq. The supreme court of Nevada, state of the controlling law on the issue in this proceeding, has not spoken on the matter.

 If Nevada recognizes the concept of "deepening insolvency" in the future, whatever form it takes will likely be subject to Nevada's codified "business judgment" rule, N.R.S. § 78.138.

1. Directors and officers shall exercise their powers in good faith and with a view to the interests of the corporation.

2. In performing their respective duties, directors and officers are entitled to rely on information, opinions, reports, books of account or statements, including financial statements and other financial data, that are prepared or presented by:

(a) One or more directors, officers or employees of the corporation reasonably believed to be reliable and competent in the matters prepared or presented;

(b) Counsel, public accounts, financial advisers, valuation advisers, investment bankers or other persons as to matters reasonably believed to be within the preparer's or presenter's professional or expert competence; or

(c) A committee on which the director or officer relying thereon does not serve, established in accordance with NRS 78.125, as to matters within the committee's designated authority and matters on which the committee is reasonably believed to merit confidence, but a

director or officer is not entitled to rely on such information, reports, books of account or statements if he has knowledge concerning the matter in question that would cause reliance thereon to be unwarranted.

3. Directors and officers, in deciding upon matters of business, are presumed to act in good faith, on an informed basis and with a view to the interests of the corporation.

4. Directors and officers, in exercising their respective powers with a view to the interests of the corporation, may consider:

 (a) The interests of the corporation's employees, suppliers, creditors and customers;

 (b) The economy of the State and Nation;

 (c) The interests of the community and of society; and

 (d) The long-term as well as short-term interests of the corporation and its stockholders, including the possibility that these interests may be best served by the continued independence of the corporation.

5. Directors and officers are not required to consider the effect of a proposed corporate action upon any particular group having an interest in the corporation as a dominant factor.

6. The provisions of subsection 4 and 5 do not create or authorize any causes of action against the corporation or its directors or officers.

7. Except as otherwise provided in NRS 35.230, 90.660, 91.250, 452.200, 452.270, 668.045 and 694A.030, or unless the articles of incorporation or an amendment thereto, in each case filed on or after October 1, 2003, provide for greater individual liability, a director or officer is not individually liable to the corporation or its stockholders or creditors for any damage as a result of any act or failure to act in his capacity as a director or officer unless it is proven that:

 (a) His act or failure to act constituted a breach of his fiduciary duties as a director or officer; and

 (b) His breach of those duties involved intentional misconduct, fraud or a knowing violation of law.

NRS § 78.138.

So, trying to discern what Nevada might do with the concept of "deepening insolvency" adds nothing to the mix in this adversary proceeding. Under NRS § 78.138, the issue is still whether the defendants breached their fiduciary duties to the corporation by self-dealing. The "deepening Insolvency" cause of action should be dismissed as redundant. *In re Greater Southeast Community Hospital Corp.*, 333 B.R. 506, 517 (Bankr.D.D.C. 2005).

*Acting In Concert.*

■ This cause of action as pleaded seems to have no parameters.

### THIRD CAUSE OF ACTION ACTING IN CONCERT (AGAINST ALL DEFENDANTS)

53) Plaintiff realleges the preceding paragraphs as though fully set forth herein.

54) The individual defendants, and other officers, directors, controlling shareholders, acted in concert with each other or, acting pursuant to a common scheme or design, committed

numerous tortuous [sic] acts against SACC.

55) The individual defendants, and other officers, directors, controlling shareholders, knew of the others' tortuous [sic] conduct. The individual defendants, and each of them, knowingly or recklessly gave substantial assistance or encouragement to each other, as well as other officers, directors, controlling shareholders, in committing their tortuous acts.

56) As a proximate result of the individual defendants' substantial assistance and encouragement in others' tortuous [sic] acts, SACC and its creditors have suffered damages in an amount to be proven at trial.

Whatever this is meant to include,[14] the pleading is redundant, as it is already fully covered in the breach of fiduciary duty count. The "acting in concert" cause of action should be dismissed, accordingly. *Id.*

*Preferential Transfers.*

 Transfers covered under 11 U.S.C. § 547 by directors of an insolvent corporation to themselves are inherently breaches of fiduciary duty owed to the corporation. The cause of action is redundant and should be dismissed. *Id.*

*Fraudulent Transfers.*

 It is possible that transfers made in good faith for services rendered can be later determined to have exceeded the value of the services, and, to that extent, fraudulent under 11 U.S.C. § 548. The cause of action is not redundant and should not be dismissed.

*Disallowance of Claims of Tenney.*

 Defendant Tenney filed a claim in the estate. That might be, but is not necessarily, covered by the breach of fiduciary duties cause of action. The cause of action should not be dismissed.

*Ultra Vires Recision.*

The plaintiff agrees that this cause of action should be dismissed, and it should be.

*Statutory Recision.*

 The plaintiff's statutory recision cause of action seeks recision of the defendants' consulting contracts on the grounds they were not approved by a majority of disinterested directors, and that they were approved by directors without portfolio as they had failed to convene annual shareholder meetings for the years 2002, 2003, and 2004, which were required to, among other things, elect directors.

The defendants argue that the contracts were approved by a majority of disinterested directors, and, even if not, that all the directors were aware of the contracts and they were fair and reasonable and benefitted the corporation. Defendant Hill argues that he was not a director in March 2003, when his contract was approved and that it was approved by the majority of disinterested directors. But, corporate records indicate that he was a director at the time, and that the contract was approved by Hill and Darrell Musick only. David Walton Sr. was also a director. Defendant Tenney's contract was approved by Hill only. Apparently, Steve King was a disinterested director at the time, and he did not participate.

NRS § 78.140 reads, in pertinent part:

1. A contract or other transaction is not void or voidable solely because:

(a) The contract or transaction is between a corporation and:

---

**14.** No specific facts are pleaded supporting this count in the amended complaint.

(1) One or more of its directors or officers; or

(2) Another corporation, firm or association in which one or more of its directors or officers are directors or officers or are financially interested; ...

2. The circumstances in which a contract or other transaction is not void or voidable pursuant to subsection 1 are:

(d) The contract or transaction is fair as to the corporation at the time it is authorized or approved.

This cause of action is redundant and should be dismissed. If the plaintiff prevails on his breach of fiduciary duties claim and fraudulent conveyance actions, the recision cause of action becomes moot. If the plaintiff fails on the breach of fiduciary duties and fraudulent conveyance actions, he also fails on statutory recision because there will be findings that the contracts were fair and reasonable to the corporation, satisfying NRS § 78.140.

*Breach of Fiduciary Duties.*

 The defendants argue that they are protected by the "business judgment rule" and an exculpatory clause in SACC's articles of incorporation. But, these do not protect officers and directors of an insolvent corporation from self-dealing to the detriment of the corporation. *Continuing Creditors' Committee of Star Telecommunications Inc. v. Edgecomb,* 385 F.Supp.2d 449, 462 (D.Del.2004) (citing *Emerald Partners v. Berlin,* 787 A.2d 85, 90 (Del.2001)); NRS § 78.037.

The defendants claim that the plaintiff has alleged no intentional misconduct by them. The assertion ignores the core premise of the plaintiff's case-that the defendants wrongfully prolonged the life of SACC specifically to enrich themselves through wasteful consulting contracts, and

to use corporate assets to ward off personal liability for SEC violations. While the record does not support summary judgment for the plaintiff on his breach of fiduciary duty cause of action, it does not support summary judgment for the defendants, either.

## V

## DISPOSITION

Based on the foregoing, it is hereby ORDERED:

1. The plaintiff's motions for summary judgment are denied.

2. The plaintiff's second, third, fourth, seventh and eighth causes of action are dismissed with prejudice.

3. The defendants' motion for summary judgment on the plaintiff's first cause of action is denied.

**ENTRY OF JUDGMENT ON THE DISMISSALS SHALL BE DEFERRED PENDING TRIAL OF THE REMAINING ISSUES IN THIS PROCEEDING.**